**MURRAY et al. v. NOBLESVILLE MILLING CO.**

No. 382.

District Court, S. D. Indiana, Indianapolis Division.

Jan. 9, 1942.

Clarence B. Ullum and Francis E. Thomason, both of Indianapolis, Ind., for plaintiff.

Fesler, Elam, Young and Fauvre, of Indianapolis, Ind., for defendant.

Alex Elson, Regional Atty., of Chicago, Ill., for Wage and Hour Division, U. S. Department of Labor.

CAMPBELL, District Judge.

### Opinion.

This is a suit brought by various employees of the defendant through an agent for unpaid overtime compensation alleged to be due by reason of the provisions of Section 7 of the Fair Labor Standards Act. 29 U.S.C.A. § 207.

The defendant operated a flour mill with two grain elevators at Noblesville, Indiana. The majority of employees for whom this action is brought had been in the employment of the defendant for some time prior to the passage of the Fair Labor Standards Act and had always received a rate of 40¢ per hour for their work and usually averaged 60 hours of work per week. A few of these employees received a rate a few cents in excess of 40¢ per hour. A few others were engaged after the effective date of the Fair Labor Standards Act.

After the passage of the Fair Labor Standards Act, the Secretary-Treasurer of the defendant company, Mr. Don B. Jenkins, on October 18, 1938, called all of these employees together in his office and advised them that he was working out an "arrangement" whereby they would continue to work substantially 60 hours per week and receive $24 weekly compensation, but that in order to conform with the Fair Labor Standards Act he would reduce the base rate of pay to 34¢ per hour and pay them for all hours over the maximum provided for in the said Act at 51¢ per hour which would approximate the same weekly wage they were receiving prior to the passage of the Act if they worked the full average work-week of 60 hours. If they worked less than the 60 hours they were to receive the old rate of 40¢ per hour. Following this explanation an attempt was made to get one of the employees to make a motion that the meeting go on record as accepting Mr. Jenkins' "arrangement". The employee refused and a foreman thereupon suggested that all employees rise to their feet and give Mr. Jenkins a vote of thanks for his interest in their behalf. The employees stood and the meeting was disbanded. Mr. Jenkins subsequently entered a notation on the records of the corporation that he had negotiated a new contract of employment with the various employees in a meeting held October 18, 1938, whereby the employees accepted a rate of pay of 34¢ per hour, and time and a half for overtime, making the average wages $24 for a 60 hour work-week.

It is the contention of the plaintiff on behalf of the employees mentioned that the regular rate of pay for the employees whom the plaintiff represents was 40¢ per hour at which rate practically all of them were hired, with the exception of a few who were hired at a slightly higher rate, and that after the Fair Labor Standards Act became effective the employees were required to work a number of hours in excess of the maximum therein prescribed, for which they have not received the time and half overtime compensation for which the Act provides.

It is the contention of the defendant that subsequent to the passage of the Fair Labor Standards Act, at a meeting of the said employees with their employer on October 18, 1938, the said employees negotiated and confirmed a new contract of employment providing for a lower rate of pay per hour than they were then receiving but in excess of the minimum set by the said Act, and that although the amount of weekly compensation in practically every case remained the same for the same number of hours worked the Act had been complied with, since, if the pay for those hours of work is computed under the new reduced hourly base rate, necessary time and a half overtime compensation has been fully paid.

██ The Court has carefully considered the evidence produced at the trial, and the many briefs submitted by both parties and by the amicus curiæ, and finds the issues for the plaintiff.

It is clear from all of the evidence, even from the testimony of the defendant's witness Jenkins, that the employees represented by the plaintiff had all been employed by the defendant at a regular rate of pay of 40¢ per hour, or slightly higher in a few instances. It is further established that subsequent to the passage of the Fair Labor Standards Act and in direct violation of Section 18 thereof, the defendant's Secretary-Treasurer Jenkins deliberately attempted to circumvent the said Act by arbitrarily reducing the basic rate of pay of his employees. His so-called "arrangement" was a mere subterfuge. The evidence is equally clear that the employees neither understood nor ratified the "arrangement". They continued to work 60 hours per week and to receive $24, the same as before the passage of the Act.

It is the opinion of the Court that the defendant violated the provisions of the Fair Labor Standards Act after its effective date and should be required to pay to its employees overtime compensation in accordance with the provisions of the said Act and based upon the hourly rate of pay that each employee was receiving prior to October 18, 1938. As to those employees employed subsequently to that date the evidence is clear that they contracted to work at a regular basic rate of 40¢ per hour and they should be correspondingly compensated for their overtime work.

██ The interstate nature of the work of all employees involved is admitted by the defendant except as to work performed by the employees Reddick and Passwater. After a consideration of the evidence introduced with reference to the type of work done by these two employees and a review of the argument of counsel with reference thereto, the Court is of the opinion that these two men were engaged in commerce within the meaning of the Fair Labor Standards Act.

██ The defendant also sets up in its answer as a defense to this suit the doctrines of estoppel and of laches. After a careful consideration of both and in the light of all of the evidence I find no merit in either.

Judgment will accordingly be rendered for the plaintiff.

## Findings of Fact.

1. The plaintiff in the above entitled case is the duly authorized and legal representative of the following named persons: Lorin Beauchamp, Ernest Brown, Mack Cook, Clary Dill, Homer Fleetwood, Gerard M. Gerard, George Gipe, Andrew Griffin, Edson L. Griffin, Carroll Guilkey, Clifford C. Hiatt, Worth Hiatt, William Holman, Edgar Lees, Gerald Lockridge, Lloyd O. Hosbaugh, Harry McGill, Ralph McGill, Paul A. Parrish, Howard Passwater, James Reddick, Randall Riasoner, Albert Shoof, and John W. Williams. Each of said persons named were employed by the defendant during all the time as set forth in Exhibit 1, in evidence in this case.

2. The defendant during all of the time here involved was and now is a corporation organized, existing and operating under and pursuant to the laws of the State of Indiana.

3. The defendant has at all times from October 24, 1938, until it ceased doing business, been engaged in milling, selling and distributing flour and other grain products, a substantial portion of which have been shipped or transported in interstate commerce.

4. The pages bound in the book introduced in evidence, marked Exhibit 1, bearing the title of this case are pages made up from the original time books of the defendant showing the pay record of each employee involved in this suit for the period of his employment during the time from the week ending October 21, 1938, to the end of the employment of each employee. The original time books were kept in a form showing on one page the pay of all the employees for each week and in compiling this exhibit the form of the record has been changed so as to show consecutively all the pay received by each employee involved in this case during the period from October 15, 1938, to the end of his employment. The exhibit correctly represents the original books.

5. All of the employees named in plaintiffs' complaint, from time to time worked in excess of 44 hours per week during the period from October 24, 1938, through October 23, 1939; they worked from time to time in excess of 42 hours per week during the period from October 24, 1939, through October 23, 1940, and in excess of 40 hours per week during the period from October 24, 1940, to the date the complaint was filed

herein. During said time said employees were not paid overtime compensation at one and one-half times their regular rate of pay.

6. The defendant's plant consisted of a flour mill, an elevator generally referred to as Elevator A, and another elevator known as Elevator B, where the greater part of its grain for milling purposes was stored. A conveyor system extended from Elevator A to Elevator B, and from Elevator A to defendant's mill.

The defendant purchased all of its local grain at Elevator A, which consisted chiefly of wheat, corn and oats. The test for the purchase of all wheat was whether it could be used for milling purposes. During all the time here involved two employees James Reddick and Howard Passwater, were working largely in Elevator A. Their duties consisted in selling some grain in local retail quantities, but they also purchased all the local wheat which defendant used in its milling operations. This wheat was received at Elevator A thence by Reddick and Passwater sent to Elevator B in a conveyor system where it was comingled with other grain of like kind, prepared for milling and reconveyed to Elevator A, where Reddick and Passwater would send it to the flour mill by the conveyor system and it would be used in milling flour. The only convenient way of transferring the grain was through Elevator A and approximately 2750 bushels of wheat would pass through Elevator A every 12 hours that the mill was in production. It would take 1½ to 3 hours time each day for this operation alone. In addition to the above duties, Reddick and Passwater, upon purchasing corn, which was usually unshelled, would shell the grain, and the cobs therefrom would be conveyed to the boiler room in the flour mill where they were burned for fuel. They also kept the machinery oiled, in running condition and kept the premises clean. On occasions Reddick would travel about the countryside inspecting grain offered for sale and if it met the test to be applied, it would be purchased.

7. Prior to the 18th day of October 1938, the defendant had a bona fide agreement with its employees to pay a stated sum per hour as wages for work to be performed and it had been the practice of the defendant to have its employees work more than 44 hours a week. The employees were paid on a straight time hourly basis for the hours they worked each week.

On the night of October 18, 1938, the defendant held at its office a meeting of the greater majority of its employees, for the purpose of discussing the operation of the Wage and Hour Act. At this meeting it advised its employees that it was not willing to pay overtime compensation based upon their present existing rate, but that it would not reduce their pay in respect to the total amount earned each week. Whereupon the defendant proposed a plan which operated as follows: for an average week of 60 hours an employee, previously engaged at a 40¢ an hour rate would thereafter be paid for the first 40 hours at 34¢ an hour and for the remaining 20 hours his overtime compensation would be at the rate of 51¢ an hour.

Since this method would only yield $23.80 as compared with $24 per week under the old rate of pay, the defendant would add a bonus of 20¢ to equal the old rate. This bonus would not be made upon a production basis but was to be given the employee for the sole purpose of equalizing his total earned pay for that week's work. This bonus would fluctuate as the occasion required; when, for example, the employee only worked 10 hours per week it would be 60¢; 20 hours $1.20; 30 hours $1.80; 40 hours $2.40; 50 hours $1.30; 60 hours 20¢ and 61 hours 9¢. If the employee's total hours exceeded 61 in any work week, no bonus would be paid.

The employees whose hourly rates of pay were slightly different were to be figured on a corresponding basis.

Thereafter defendant put the foregoing plan into effect and revised its bookkeeping system to reflect it.

8. A majority of the employees named in the complaint continued to work for defendant until it closed its plant on or about March 10, 1941.

9. The new pay arrangement described above (#7) was not a bona fide contract by defendant with its employees. It was even considered by defendant as merely a bookkeeping system. Defendant thereafter on several occasions employed other men to work in its plant and when they were engaged advised them that their rate of pay was 40¢ an hour, although bookkeeping entries disclose that the defendant used the same plan in making their wage computations as is described above (#7). Lorin

Beauchamp, Carroll Guilkey, Clifford G. Hiatt, Worth Hiatt and Albert Shoof were so employed and paid subsequent to October 18, 1939.

10. Defendant's employees never knew exactly how to figure their pay after October 18, 1939, but always considered that it remained unchanged, as in practically all instances the total hours worked multiplied by 40¢ an hour equaled their total weeks compensation.

### Conclusions of Law.

1. All of the employees, including Reddick and Passwater represented by the plaintiff herein were engaged, during their employment by the defendant, in commerce within the meaning of the Fair Labor Standards Act of 1938.

2. The defendant is an Indiana Corporation and is also engaged in commerce within the meaning of the said Act.

3. None of the employees represented by the plaintiff have been compensated by the defendant for overtime work performed subsequent to the effective date of the said Fair Labor Standards Act as required by Section 7 thereof and are all entitled to such compensation.

4. That the law is with the plaintiff and he is entitled to judgment as prayed for in his complaint.